WILLIAM B. HENDERSON AND THOMAS COSTELLO, *Plaintiffs in Error,* v. STATE OF FLORIDA, *Defendant in Error.*

Division A.

Opinion Filed August 1, 1927.

*E. L. Bryan,* Attorney for Plaintiffs in Error;

*J. B. Johnson,* Attorney General, for Defendant in Error.

## STATEMENT OF FACTS.

Plaintiffs in error were convicted on July 29, 1926, in the Circuit Court for Hillsborough County, of murder in the first degree and sentenced to death by electrocution. The case is before us for review upon writ of error sued out in November, 1926, the transcript being filed in this Court January 27, 1927. Pursuant to request, oral argument was granted and the case was argued orally before this Court on April 26, 1927.

There are thirty-eight assignments of error, a considerable portion of which have been abandoned.

At about nine o'clock on the night of May 11, 1926, two men entered La Florida Restaurant, fronting on Four-

teenth Street at the corner of Eighth Avenue in the City of Tampa, rifled the cash register and shot and killed Antonio Regueria, one of the proprietors. Besides the deceased there were in the restaurant at the time S. Garcia, a partner of the deceased; Jose Regueria, son of the deceased, and acting as manager of the restaurant; Lopez and Flores, waiters; Martinez, the cook; and two guests. Another guest, F. R. Wheyland, a local newspaper man, had just left the restaurant and gone to his automobile across Fourteenth Street, which street was brilliantly lighted. After the shooting he saw one of the men rushing out of the Fourteenth Street entrance across the sidewalk and into the street, where he whirled around and then fled down the street.

When the two men entered the restaurant, Jose Regueria and the waiter, Flores, were eating their supper at one of the tables; Lopez, the other waiter, was standing nearby; the cook was in the rear putting on his hat and coat, preparatory to going home; Mr. Garcia was back in the office just a short distance in the rear of the sandwich counter, called the "canteen"; the two guests, Moller and a friend, were seated at one of the tables; Mr. Antonio Regueria was standing behind the counter of the canteen. The men entered quickly, flashed their pistols, and the taller of the two, a rather tall man with a bump or scar on the side of his face, ordered all present not to move. He then advanced to the cash register and pulled it around with one hand, while the other man, not so tall but more stockily built, went back to the far end of the canteen and covered Regueria with his revolver. About that time, Martinez, the cook, preparing to go home, came by the canteen, and the stockily built man turned and shoved him out of the side door on Eighth Avenue. At this, seizing the opportunity at once, Regueria rushed back into the office at the rear of the canteen,

▬▬▬▬▬▬▬▬▬▬▬▬▬▬

secured his pistol from the desk, and came back with his pistol in his hand, pointing downward, followed by Garcia. When Regueria returned to the canteen both bandits fired at him; the one at the cash register three shots, and the man across the counter from him twice. One of the shots, evidently fired by the stockily built man, because it entered his left side below the armpit and went through his body, was fatal, and he died quite soon thereafter without having uttered a word. As he fell he fired, or his pistol went off, the bullet hitting above the front door. The bandits then escaped; the tall man, who had taken some $265.00 from the cash register, by the front door on Fourteenth Street, and the other by the rear or side door.

. Those present described these men as being bareheaded, dressed in light-colored shirts and dark trousers, in their shirt sleeves, without collars, shirts open at collar; one a rather tall, blondish man with a bump or scar of some sort on the side of his face, and the other not so tall, more heavily built than the other and darker, or of a brunette type.

Six days later, on May 17th, these two defendants were arrested in Pensacola and brought to Tampa. Garcia, young Regueria, and the two waiters, Lopez and Flores, were taken to the jail. The defendants were placed in a line, with some seven or eight other adult male prisoners, in the lobby of the jail and the said eye-witnesses were brought in one at a time. Each time a new witness was brought in the position of the defendants in the line had been changed. Each of these eye-witnesses to the robbery and killing picked these two defendants out of the men in the line as the men who had entered the restaurant on the night of May 11th and perpetrated the robbery and killing. In their testimony they stated they positively identified the defendant Henderson as the taller man, with the bump

or scar on the side of his face, who had advanced to and robbed the cash register, and the defendant Costello as the man who had gone back to the canteen and fired the shot which killed Regueria. There was evidence that before this the pictures of these men had appeared in two of the Tampa papers. They were asked if they had not seen the pictures of these men in the newspapers before identifying them at the jail, but they said they spoke very little English and did not read the newspapers printed in English and had not seen any pictures of these men at the time.

The cook, who was pushed out of the side entrance, identified Costello as the man who had thus used him; Wheyland, the newspaper man, who was in his car across the narrow street, was positive that Henderson was the man who ran out of the front entrance immediately after the shooting, whirled and fled down the street; Moller, one of the guests, ducked under the table as soon as the shooting began, but said: he "believed" the defendant Henderson was the man who went to the cash register and turned it around.

Francis Delgado, clerk in the DeLux Drugstore on Nebraska Ave. Street, identified Henderson as one of two men who entered the Drugstore at about 8:30 the same night that Regueria was killed, and rifled the cash register, leaving the Drugstore at 8:30. He said he could not place the other man but he recognized Henderson on account of the bump on his face. E. F. Bario, who worked in the same Drugstore, identified both defendants and said they were in the Drugstore about eight to ten minutes.

H. D. Wade, who was working at a filling station at Florida Ave. and Oak Streets, testified that two men came to his filling station around 8:30, but he could not be positive that the defendants were the same men. He said one of the men, a tall man, "had a knot on his right jaw.

Looked like he might have had a bad lick, or something like that. He didn't have on any hat, and was in his shirt sleeves. * * * He had on dark trousers. * * * He was in his shirt sleeves and had on more than one shirt. * * * Because when he went to put his gun back in his bosom he opened his shirt to hide his gun." He said, however, that this man appeared to him to be a heavier and larger man than Henderson, though he resembled him very much and had features very much like his.

Jose Regueria, Garcia, and the two waiters, testified positively that the two men on trial were the same two men who entered the restaurant on the night of May 11th. Young Regueria said, on cross examination: "I have a picture placed in my mind of these two men, and as long as I live I won't forget them."

The defendants denied that they were in Tampa at the time and introduced evidence tending to prove an alibi. They testified that they met for the first time in Miami on May 9th and planned to drive to New York in Henderson's car, a Chrysler coach, which he claimed to have purchased in Miami in April, but decided to go to Henderson's former home in Blountstown so Henderson could sign some papers his mother wanted him to sign so she could dispose of some property. That they left Miami about 1 or 2 o'clock in the afternoon of May 9th and drove to Jacksonville, leaving there about 1:30 on the afternoon of Monday, May 10th, and driving west via Lake City, Tallahassee, River Junction and Sneeds, where they stopped for about thirty minutes to have a punctured tire fixed and to get supper, Henderson having some conversation with the proprietor of the restaurant; thence driving southward to Henderson's uncle's house about nine miles from Blountstown, reaching there about 9:30, where they spent the night. That they left this uncle's place the next morn-

ing at 6:30 and reached the home of Henderson's mother in Blountstown about 7:30 on the morning of Tuesday, May 11th. That Henderson's mother was at home but his sister had driven over to Clarksville, about seven miles away, to go fishing, and after breakfast they drove over there and got his sister and returned to his mother's house. Then, after his mother and sister had changed their dresses, they drove up to Marianna, arriving there about noon. They went to a Mr. Goldston's real estate office, but he was not there. Then to the City Cafe, which was run by a man named Miller, for dinner. Then they went back to the real estate office; then to the bank; then to a barber shop, where the two men were shaved; then they drove out to the ice plant to see the new bridge; then back to town; then to his aunt's house at Alliance, fifteen miles from Marianna; then back to his mother's place in Blountstown, where they arrived around 4 o'clock.

That they spent the balance of the day and evening of May 11th in and around Blountstown, meeting and talking with various people, and the night of May 11th at Henderson's mothers house. The next day was employed in driving around the country, through Marianna to Collinsville, Cottondale and Chipley; thence to Blountstown via Marianna. That they ran into a Ford car that evening in Blountstown and left the damaged Chrysler car parked on the side of a street about a block and a half from the court house, which was the last they saw of it. Spent the night, May 12th, at Henderson's mothers house, and left the next morning, Thursday, May 13th, Henderson's sister driving them in her Ford car to Bonifay, on the railroad west of Marianna, where they took the train for Pensacola.

It is not denied that these men were in Blountstown and vicinity during that week, but the contention of the State was that it was the latter part of the week instead of the

earlier or middle part of the week. The defendants did not introduce any evidence to corroborate their story of the trip from Miami via Jacksonville to Sneeds. Their first corroborative testimony begins with their arrival at the home of Sam Montford, Henderson's uncle, nine miles from Blountstown, at 9:30 on the night of May 10th. They testified to having had supper and a punctured tire repaired at Sneeds, about 8 to 8:30 the same evening; thence going to the uncle's house. But the testimony of Mr. Hamm, the restaurant keeper, and Mr. McCowan, the garage man at Sneeds, tended strongly to show that these men reached there on the night of Thursday, May 13th. Mr. Hamm said he remembered fixing supper for them and conversing with Henderson, who told him he was the son of Charley Henderson, who in his life time was well known to Mr. Hamm. Mr. McCowan said the reason he recalled that the night the work was done on the car was the night of the 13th was, to use his words: "Well, the conference for the Marianna district had convened there at home, and had convened on the morning of the 12th, and we were in session two days then, and this was the night that they finished with the conference and the conference adjourned. That was the Marianna District Conference of the Methodist Church." But the uncle, Sam Montford, corroborating the defendants, testified that it was Monday night, the 10th, that the men arrived at his house, between 9 and 10 o'clock; that he remembered the date because Mr. I. C. Adkins owed him some $10.00 or $20.00 and was to have paid him on Saturday, the 8th, but did not do so, and came to his house and paid him on the following Monday night, and was there when the defendants came in. Mr. Adkins said he remembered these defendants coming to Mr. Montford's house when he went there to pay him some money, but he could not remember the exact date; that he

was to have paid the money on Saturday, the 8th, but did not, and did not pay it on Sunday, and that he went there to pay him "the early part of the second week."

Henderson's mother and sister corroborated the defendants as to the time of their visit and as to what they did and where they went, but their reasons for remembering the date of their arrival in Blountstown were rather weak and unsatisfactory. For instance, one reason the mother gave was that her daughter had for several days beforehand set that date, May 11th, as a day to go fishing, whereas the daughter testified that she had not decided to go fishing until the night before she went—the night of the 10th.

There were several other witnesess whose testimony corroborated that of the defendants as to the dates of their presence in Blountstown and Marianna and vicinity on the 11th, 12th and 13th, while the State introduced several to the contrary. The testimony of one of defendant's witnesses, John H. Miller, who ran the City Cafe in Marianna, was discredited or at least seriously contradicted, by the testimony of Sheriff Lewis of Marianna on material points.

On the whole, the testimony introduced by the defendants to prove their alibi fails to carry conviction with it as to the correctness of the dates. There is no question but that these defendants were in Blountstown, Marianna and vicinity during that week, but the vital question was as to what part of the week—the earlier or the latter portion.

The two barbers, Croft and Richards, who shaved Henderson and Costello in the barber shop at Marianna, both testified that these men visited their shop and were shaved by them on the 14th instead of the 11th of May, as contended by defendants.

George Pelt of Blountstown, who said he had known

Henderson all his life, testified to having had a conversation with Henderson in the dining room of the latter's mother's home about dark on the evening of Friday, May 14th, Henderson's mother and sister and grandmother and Costello being present. That in that conversation Henderson told him that he had arrived there that day from "down south." On cross examination he said that he went to Blountstown the next day, Saturday, about 12 o'clock, "and when I got to the town of Blountstown I heard about all this fracas, about trying to catch these two boys; that was Saturday, the 15th of May."

W. T. McClellan, merchant of Blountstown, also testified that he had known Henderson all his life; that on Friday afternoon, May 14th, he was coming across the street in Blountstown between 4 and 5 o'clock in the afternoon and some one came along in an automobile and helloed at him. He went over and found it was Henderson; that he shook hands with him and talked for about fifteen minutes; that he asked Henderson when he came in and he said he came in that morning from Jacksonville; that Henderson told him he had made enough to settle down and make a living and that his business was robbery.

J. H. Bailey also testified that Henderson called on him in Blountstown on Friday afternoon but he could not remember the date.

Mr. Clark, Sheriff of Calhoun County, said that he had been summoned and testified as a witness in the United States Court in Pensacola on the 13th and drove from there to Blountstown, arriving a little after dark on the 14th of May. That about 11 or 12 o'clock that night he found an abandoned Chrysler car along the railroad just beyond the end of a little blind street running east from the court house a short distance. That he had the car cranked up and drove it back and put it in the jail yard. That at about

8 o'clock the next morning, Saturday the 15th, while he was sitting in his car near the court house, Mrs. Green, Henderson's mother, came up and asked him to turn the car over to her; that it was her son's, and he had turned it over to her, but that he refused to turn the car over until its ownership was proved. That in the conversation she asked him what Mr. Butler, the Chief of Police there, had wanted with "Will" the night before, and he replied that he presumed he wanted him for being drunk and having a concealed pistol. That she further said that Will and a friend of his came to her house the morning before that, and that she and her daughter and Will and his friend went to Marianna, had dinner at a cafe, and stayed there some considerable time, and that it looked like if Mr. Lewis (evidently referring to the Sheriff of Jackson County) had wanted Will he would have got him while he was there.

A Mr. Stanfill testified to being with Sheriff Clark when he took possession of the Chrysler car and said it was on Friday night, May 14th.

Manuel Garcia, a Tampa resturant keeper, testified that he saw the defendants, who took supper at his restaurant, at Seventh Avenue and Twenty-Second Street in Tampa, on Monday night, May 10th, at about 8 o'clock. That they were seated at a table in the back of the restaurant and his attention was attracted to them because they were hurrying the waiter in loud tones; that the waiter asked him to speak to them, and that a chauffeur who was in there told them all the men wanted was their supper in a hurry and he told them their supper was coming. He said Henderson got up and walked back to the kitchen twice and went in the kitchen the second time and looked around, something customers did not do.

An attorney for the defendants testified that he was in

Blountstown on July 21, 1926, just a few days before the trial of this case, and that the State's witness McClellan told him he would not be able to testify definitely as to the date the defendants were there, either the 11th or 12th. That he also spoke to State's witness Craft, the Marianna barber, who told him that as to the date the men were shaved it was on Monday, and then said: "No, he could not swear to the date. That there was nothing particularly which fixed it in his mind." Both these witnesses were returned to the stand by the State and denied making such statements and gave a different version of their conversation in that regard with such Attorney.

Mr. Pinton, Sheriff of Escambia County, testified that when Henderson and Costello were arrested in Pensacola they gave their names as Shannon and Mitchell respectively. Henderson testified that the officers told him that they understood that he had been going by the name of Shannon around there and that he told them his name was Henderson. Costello testified that he gave his name to the officers as Mitchell but that he had been introducing Henderson to the "girls" they had been going with in Pensacola as "Shannon" because Henderson was a married man and he did not want to get him in trouble with his wife. When told what they were wanted for the defendants denied any connection with the crime and said they were not in Tampa that night.

On their way to Tampa in an automobile, Deputy Sheriff Taylor of Hillsborough County, said he heard Costello say to Henderson: "That bump on your face will give you away any place." And again: "The bump on your face is where we get caught. You can't get away from anything." The defendants said they were not discussing this matter at all but the Al House case and other criminal cases that had been given considerable publicity and that Costello made some remark to the effect that Henderson could not

get away from any such thing if he were to try it because of the mark or bump on his face. The officer further said Henderson told him that he had not met Costello until May 11th; that he picked him up in Jacksonville to drive his car for him. This the defendants denied.

BROWN, J. (After stating the facts above.):

The first and second assignments of error are abandoned and we deem the third, fourth and fifth innocuous. The sixth and seventh assignments of error raise the same question. The witness Moller, who got under the table when the shooting began, was asked: ''Look at these defendants, * * * and state whether or not you can identify either one of them as the man that you say began to turn the cash register around?'' to which he answered: ''I believe that is the man there, the man to the left.'' (Indicating Henderson.) The defense objected to this answer as to witness' belief, and asked that it be stricken. The Court declined to strike it and defendants excepted. Later on the State asked the same witness the following question: ''State, Mr. Moller, whether to the best of your knowledge and belief, that is the man?'' Defendant objected and excepted. Witness was permitted to answer, and said: ''I believe he is the man.''

If this had been the only identification testimony the jury may have refused to convict; or, if they had, the verdict might have been set aside, but as there were several other witnesses present at the commission of the crime who positively identified this as well as the other defendant, and who had had a better opportunity for observation than this witness, we think the Court was without error in admitting this testimony, for whatever it may have been worth, for consideration by the jury in connection with the other testimony. It was the testimony of an

apparently disinterested witness which tended to corroborate the positive testimony of the other witnesses present. The testimonial force, or probative effect, to be accorded to the statement of this witness was for the jury, but we think the Court was correct in letting it go to them. The admissibility of testimony does not depend upon its sufficiency, standing alone, to prove the issue.

Testimony as to identity is in the nature of opinion evidence. Provided he bases his testimony on his own knowledge, and not on information furnished by another, the opinion, belief, judgment, or impression of an ordinary (non-expert) witness as to the identity of a person, or an object, is admissible in evidence. The witness may, of course, be cross-examined as to the basis for his opinion, or belief, so that the jury can judge as to the probative value thereof. 16 C. J. 547-8, 750 22 C. J. 597, and cases cited; Wigmore on Evidence, Sects. 149, 660, 1130 and 1977; 1 Greenleaf on Evidence, Sec. 440; Thornton v. State, 113 Ala. 43, 21 South. Rep. 356; Mack v. State, 54 Fla. 55, 44 South. Rep. 706, 13 L. R. A. (N. S.) 373; Killingsworth v. State, 90 Fla. 299, 105 South. Rep. 834; Pennington v. State, Fla. ——, 107 South. Rep. 331; Alford v. State, 47 Fla. 1, 36 South. Rep. 436; Roberson v. State, 40 Fla. 509, 24 South. Rep. 474; Jordan v. State, 50 Fla. 94; 39 So. 155.

In the Mack case, *supra*, the prosecutrix was allowed to identify her assailant, whom she never saw, merely by having heard his voice at the time of the assault, but which was so indelibly impressed upon her memory during those tragic moments that when the accused and several others were brought into an adjoining room and engaged in conversation she immediately recognized and identified that voice which had struck terror to her soul on the darkness of that awful night. See also State v. Spadoni, Wash.

——, 243 Pac. Rep. 854; Mitchell v. State, 43 Fla. 584, 31 South. Rep. 242; Sims v. State, 59 Fla. 38, 52 South. Rep. 198. "The identification by the witness need not be positive or certain; it is enough for him to testify that his opinion, belief or judgment is that accused is the person whom he saw commit the crime." 16 C. J. Sec. 1050, p. 548; State v. Morrow, 63 Wash. 297, 115 Pac. Rep. 161, Ann. Cas. 1912D 570. So, these assignments of error are untenable.

The eighth and ninth assignments are abandoned. Assignments ten to fourteen relate to rulings upon questions to witnesses, the last two complained of not having been answered. No reversible error appears.

As to the fifteenth assignment of error, witness Miller, for defendant, on cross-examination by the State, was asked if he was down there on the first trial of this case, to which he replied in the affirmative. Q. "We testify for the defendants?" Answer. "Yes, sir." Q. "Did you testify for them?" Answer. "No Sir." Q. "After you left here, where did you go?" Answer. "Back to Marianna." Q. "Were you arrested there?" Objected to by defendant. The question by the State to the witness Miller as to whether he had been arrested in Marianna after he returned there from Tampa, after the first trial of the case, was never answered. On objection by the defense, the jury were sent out and the question of admissibility argued. The jury were returned, and the State was merely permitted to show by the witness that after he went back to Marianna, Mrs. Green, mother of Henderson, had put up a cash bond of $300.00 for him; that this occurred "last Wednesday a week ago." This was admitted over the objection of defendants, but was not error. It is permissible to show the relations existing between a witness and the party for whom he testifies, or whether he

is under personal obligations to such party, or to one as closely identified with the result of the trial as the mother, father or wife of such party. This does not necessarily discredit the testimony of a witness, but the jury may give it such weight as they see fit, in connection with the other evidence and the demeanor of the witness upon the stand, in determining the accuracy, truthfulness and sincerity *vel non* of such witness, and what credit they will accord to his testimony. See generally 40 Cyc. 2572, et seq., 2680, et seq.

It is argued that this ruling of the Court was incorrect because this witness had been brought to Tampa on subpoena for the State. The theory that a party cannot discredit his own witness cannot apply here. Regardless of who subpoenaed him, the fact remains that it was the defendants who put Miller on the stand. It appears from other evidence in the case that on the first trial of this case Miller was subpoenaed by the defendants, and Sheriff Lewis of Marianna, testified that when he served the subpoena on Miller the latter told him that "they need not be so anxious to get him down"; that Mrs. Green, Henderson's mother, and her daughter, had called on him and wanted him to swear Henderson and Costello were in his cafe in Marianna on the 11th and he, Miller, said it was the 14th; that the reason he remembered the date was that on the 15th he saw them at Cottondale and Chipley, and he drew two checks on that date, one to a credit company in Cottondale for $2.00 and one to the Chipley Hardware Company for less than $2.00, about $1.90.

Sheriff Lewis further testified that after the first trial Miller returned to Marianna with him in his automobile, (Miller having testified that the sheriff took him back under arrest), and on the way back Miller told him he had not testified and showed him the two checks referred to,

and that they were both dated "5/15-26"; that since the first trial he, Sheriff Lewis, had written the State Attorney of this, and after that Miller had been subpoenaed by the State; that on the day before, in Tampa, at the entrance to the court house, Miller had told him, Lewis, that he had lost the checks but remembered the dates; that the check which had been filed in evidence by the defendants in connection with Miller's testimony, dated May 12th, was not one of the two checks which Miller had shown him. When Miller was being questioned by defendants' counsel about the checks, he had produced two checks, but counsel only offered one in evidence, saying that the other was not material evidence in the case. The State Attorney requested that he be permitted to see the other check, but this request was refused and the Court sustained the right of counsel for the defense to withhold such check.

When the ruling of the Court is considered in connection with this other evidence, though introduced later in the trial, we hold that the Court was without error in permitting the State to show that before Miller came down to testify on this trial Henderson's mother had put up a cash bond for him.

The sixteenth, seventeenth and eighteenth assignments are abandoned. The remaining assignments, from the nineteenth to the thirty-sixth inclusive, are based upon alleged improper argument by the State Attorney. The thirty-seventh is based upon the denial of the motion for new trial; and the last, the thirty-eighth, upon the general allegation that the court below had denied the defendants' rights to a fair and impartial trial, as shown by the order appended to the motion for a new trial, "which shows the frame of mind in which the court was during said time, and that the defendants' rights to a fair and impartial trial was denied them."

As we have seen, there was no reversible error, if error at all, in any of the rulings of the trial court on the evidence. The record shows that in all his rulings upon objections to testimony by either side the trial judge showed a commendable effort to be fair and impartial, and a clear grasp of the rules of evidence as well. And the court's charge to the jury appears to have been not only correct, but fair and impartial.

So far as the evidence was concerned, it was amply sufficient to sustain the verdict; and the trial court was correct, as to those grounds of the motion for new trial addressed to the sufficiency of the evidence, in denying such motion.

It only remains for us to consider whether there was any reversible error shown under those assignments attacking the argument of counsel for the State and the statement of the court appended to the order denying motion for new trial.

Counsel for plaintiffs in error in their briefs admit that "in order to get the questions of the kind raised by these assignments of error before the Court for review, specific objections should have been made in each instance of improper conduct and argument—and specific exceptions should have been taken to each specific ruling." And counsel admit that this was not done in this case, but ask that the Court consider such assignments notwithstanding, because, in the language of their brief, "it is not necessary for an attorney to subject himself to punishment for contempt of court by persisting in his objections if the court has peremptorily ruled that he must not interrupt the State's attorney in his argument. It occurred in this case, and while for some reason unknown to us the court reporter failed to get this instance in the record, it is preserved in the record by the motion for new trial and by

to foot-note appended by the court to his order overruling the motion for new trial." And attention is called to the 16th ground of the motion for new trial. This ground is very general in its terms. It recites that when the State Attorney ''was prejudicially misquoting the testimony to the jury and defendants' counsel arose to protest against such procedure, the court peremptorily ordered defendants' counsel not to interrupt the State's Attorney in his argument." What it was that the State's Attorney said which, it is alleged, constituted a misquotation of the testimony, is not shown, Evidently the trial judge did not consider it, whatever it was, a misquotation, and the trial judge may have been right. At least, an appellate court is bound to so presume unless there is a clear showing to the contrary, which is not the case here. O'Steen v. State, (Fla.) Ill So. 725. And if perchance the trial court was right, perhaps he was right also in deeming the particular objection and interruption unwarranted, and hence felt justified in warning defendants' counsel not to make further interruptions of that sort. However, the court would have been committing grave error as well as injustice to have in effect denied defendants' counsel the right to interpose any other and further objections to the argument of counsel for the prosecution, regardless of their character or propriety. If it were properly made to appear in any case that the trial judge had so gagged or closed the mouths of defendants' counsel, an appellate court might well proceed to consider all assignments attacking the propriety of the argument for the prosecution thereafter made, on the assumption that specific objections would have been made but for the court's arbitrary action. See People v. Fielding, 158 N. Y. 542, 46 L. R. A. 641. A trial judge should not attempt to shut off proper objections to argument. On the other hand, a trial judge is not required to

sit supinely by and see the argument of counsel for either side needlessly mutilated or destroyed by repeated captious and unfounded objections of opposing counsel. Considerable power and latitude are vested in the trial judge in such matters, and an important duty and responsibility imposed upon him, and his control over the arguments of counsel will not be disturbed by an appellate court unless a clear abuse of judicial discretion is shown. Carter v. State, 68 Fla. 143, 66 So. 1000; Young v. State, 70 Fla. 211, 70 So. 19.

But the contention of counsel for plaintiff in error that the recital above mentioned in the motion for new trial is sufficient to get the various objections to the argument of the State Attorney before us for review is a mistaken one. Recitals in a motion for new trial are not evidence or proof of the facts stated or asserted in such motion. Taylor v. State, 88 Fla. 555, 102 So. 884. Also see numerous citations of decisions by this Court to same effect, in 2 Fla. Digest, 687; 4 Fla. Digest, 494.

The record before us of the trial admittedly fails to show any statement or ruling by the court below shutting off objections to argument, and the mere recital to that effect in the motion for new trial, unsupported by the record, cannot be considered. Nor do we comprehend how the statement of the trial judge appended to the order denying the motion for new trial can be considered as in any wise supplying this deficiency in the record, or in any way aiding this contention.

While it is the duty of the trial judge, whether requested or not, to check improper remarks of counsel to the jury, and to seek by proper instructions to the jury to remove any prejudicial effect they may be calculated to have against the opposite party, the general rule is that a verdict will not be set aside by an appellate court because of such

remarks or because of any omission of the judge to perform his duty in the matter, unless objection was made at the time of their utterance and a ruling of the court secured thereon, and an exception to such ruling duly taken. Graham v. State, 72 Fla. 510, 73 So. 594, and cases cited; Akin v. State, 86 Fla. 564, 98 So. 609; 16 C. J. 914. This rule is, however, subject to the exception that if the improper remarks are so obviously prejudicial and of such a character "that neither rebuke nor retraction may entirely destroy their sinister influence," a new trial should be awarded regardless of the want of objection or exception. Akin v. State, *supra;* 16 C. J. 914.

The question is, do the remarks of the State Attorney in his closing argument, not properly objected and excepted to, so far as the record shows, but the court's permission of which is here assigned as error, fall within the exception referred to in the Akin case, and call for a reversal and new trial, in spite of the fact that there was ample evidence to sustain the verdict, both as to the commission of the crime and the identity of the accused, as well as evidence from which the jury might reasonably have inferred that the alibi set up by the defendants was spurious. Also, in face of the fact that the remarks of the State's Attorney, here complained of, had been provoked by and made in reply to statements and charges which had been boldly and forcefully made against him by defendant's counsel in the heat of argument to the jury—charges which we feel sure counsel on calm second thought regretted having made. Under such circumstances, it would indeed require a very strong showing to authorize this Court to set aside the judgment of conviction on the ground of improper argument. While we do not consider that counsel for the defense in this case deliberately or intentionally brought about this situation, we cannot afford to lay down a rule here which would make

it hereafter possible for an attorney for the defendant in any hard-fought criminal case to deliberately goad the State's Attorney, by unfounded or improper charges and insinuations, into heated, indiscreet and improper reply, and to then use such reply to secure a reversal of the case, regardless of the sufficiency of the evidence, thus enabling him to take advantage of his own wrong. This would indeed be a dangerous precedent. We do not for a moment believe that any of the attorneys connected with this case would premeditatedly resort to any such tactics. But the fact remains that in the heat of the argument of this hotly contested case, counsel for the defense made a very severe attack upon the State Attorney. And the State Attorney made a very severe and scathing reply, as well as counter-attack. Having erroneously permitted counsel for the defendants to make these charges against the State Attorney, the learned trial judge was but fair in giving the latter adequate opportunity for refutation and reply. And plaintiffs in error cannot complain of their own attorney's action in making these charges, or of the court's error in allowing such charges to be made, and are therefore not in a position to complain of the court's action in permitting the State's Attorney to reply thereto. As to proceedings in court, the attorney has full authority to act for his client. 6 C. J. 641, 643. Why the distinguished trial judge, who has achieved such a fair repute as an able, firm, fair and courageous trial jurist, should have failed to promptly check the improper argument of defendants' attorney in the beginning, the record does not explain. Of course, there are times when in the excitement of court room debate an attorney may hurl forth some short, but improper and prejudicial, statement with such rapid vehemence as to make it impracticable to halt him until too late to stop the utterance. The court can then only visit upon such attorney prompt and

fitting rebuke, or punishment, or both, and give the jury appropriate instructions not to regard it, and attempt so far as possible to counteract or prevent its unfavorable tendency or influence upon the jury; and then prevent any further reference to the matter by either side. But in this case, as shown by page 335 of the record, counsel for the defendants was allowed to make improper argument reflecting upon the conduct of the State Attorney in thise case, and even in other cases. Counsel should be allowed wide latitude in argument, but there are well recognized limits to legitimate argument, and the statement of the trial judge appended to his order denying motion for new trial shows that defendants' counsel far transcended such limits. And the reply of the State Attorney not only went the limit as a reply to and refutation of the charges, but, in the heat of argument, somewhat further than was necessary or proper. Practically all portions of the State Attorney's argument here complained of deal with the personal altercation between counsel precipitated by the charges made by defendants' counsel. The parts of the argument complained of did not contain a criticism of the defendants themselves, but was leveled at defendants' counsel and their conduct. What effect, if any, this had upon the jury's consideration of the evidence, and the verdict reached, it is impossible for us to say. Certainly upon this evidence, we cannot say that there is anything to show that the verdict was influenced by or based upon anything outside of the evidence. But it is possible that the average jury will to some extent identify the cause of a party litigant with the advocate of that cause, and anything transpiring in the course of the trial which reflects upon the advocate may react unfavorably also upon the cause he represents. For this reason, a trial court should rigorously use its power to keep out all personal altercations between counsel. In this case, the

lives of two men were at stake. Whether the grave issues involved were to any extent beclouded or obscured by this unseemly and bitter altercation between opposing counsel in this particular instance, and the jury's verdict influenced thereby, we have no means of knowing, but the record does not show it, and we would be entering the field of conjecture if we ventured to express an opinion thereon. We might say, however, that generally speaking, there is danger that bitter altercations between counsel in the trial of a cause, may at times have a tendency to obscure the issues and influence the jury one way or another, when they should be influenced only by the law and the evidence, and reasonable deductions and inferences therefrom, aided of course in this by full play of all fair and legitimate argument of counsel on both sides of the question involved. The matter of controlling argument and keeping zealous and excited counsel within proper bounds, and doing so with perfect fairness to both sides, and so as to require the entire proceedings to comport with that order, decorum and dignity which should always characterize judicial proceedings, is one of the most difficult and delicate duties of a *nisi prius* judge, and this Court has always upheld the exercise of the trial court's large discretion in such matters whenever possible to do so. In fact, the exercise of this control and discretion by the judge is in many cases put beyond the reach of effective appellate review, which but increases the grave responsibility resting upon our trial judges in such matter to see to it that every defendant, whether he be innocent or guilty, rich or poor, high or low, shall have a fair trial in our temples of justice.

Section 2812 Revised General Statutes of Florida provides that no judgment shall be reversed for error in procedure, ''unless, in the opinion of the court to which application is made, after an examination of the entire case, it

shall appear that the error complained of has resulted in a miscarriage of justice." As there was amply sufficient evidence to sustain the verdict in this case, we cannot say there was a "miscarriage of justice." In fact, after carefully reading and analyzing the testimony and the entire record in this case, while realizing as we do the element of uncertainty and liability to err in most human affairs, and the fallibility of human minda, our own included, we certainly cannot say that in our opinion the jury should have rendered any other verdict than the one they did render. The language of the statute above mentioned makes it clear that it was the purpose of the Legislature that verdicts and judgments of trial courts should not be overturned and set aside by this Court on account of mere errors committed in the court below unless it is made to appear to this Court, after inspection of the entire record, that the errors complained were prejudicial and injurious in their nature and tendency and resulted in a miscarriage of justice. This statute was no doubt based upon the idea that if the result of a trial, the verdict and judgment, was just and right, even though there were technical errors committed by the trial court, no good purpose could be subserved by the labor, expense and delay of trying the case over again. And to make this intention effective, the statute was so framed as to require it to be *made to appear* to the reviewing court that the error complained of caused, or at least contributed to causing or reasonably tended to cause, the result, and that the result was wrong —a miscarriage of justice. Such is the plain import of the statute, and such was the tendency and import of the decisions of this Court for many years before the statute was enacted. Butler v. State, decided at the January Term, 1927, of this Court; Ellis v. State, 86 Fla. 56, 97 So. 287; Dixon v. State, 79 Fla. 586; 84 So. 541; Settles v.

State, 75 Fla. 296, 78 So. 287; Seymour v. State, 66 Fla. 133, 63 So. 7; McQuagge v. State, 80 Fla. 768, 87 So. 60; Gee v. State, 61 Fla. 22, 54 So. 458; Cooley v. State, 85 Fla. 46, 95 So. 126; Joyner v. State, 85 Fla. 384, 96 So. 155; Shuler v. State, 84 Fla. 414, 93 So. 672; Crawford v. State, 86 Fla. 94, 97 So. 288; Jacques v. State, 86 Fla. 137, 97 So. 380; White v. State, 84 Fla. 677, 95 So. 113; Holmberg v. Hardee, 90 Fla. 787, 108 So. 213; Stephens v. State, (Fla.) 109 So. 303; Herd v. Maloney, (Fla.) 110 So. 349; O'Steen v. State, (Fla.) 111 So. 725; Pearce v. State, (Fla.) 112 So. 83.

It would unduly lengthen this opinion to set out or discuss in detail that portion of the argument of defendants' counsel making charges of misconduct against counsel for the State, or those portions of the argument of the State's Attorney which form the basis of assignments of errors 20 to 36 inclusive. Some of these assignments call attention to argument by the State Attorney which was justifiable, in explanation of and in reply to the charges made against him, under the peculiar circumstances of the case; some were improper and no doubt regretted afterwards by the distinguished gentlemen who uttered them. The use of inflammatory language by State's counsel in the prosecution of persons charged with crime is most unfortunate. Pearce v. State, 112 So. 83, 93 Fla. 504.

In the case of Washington v. State 86 Fla. 533, 98 So. 605, where the lines of demarcation between legitimate and improper argument are pointed out, it was well said by this Court, speaking through Mr. Justice TERRELL: "The prosecuting attorney occupies a semi-judicial position. He is a sworn officer of the Government with no greater duty imposed on him than to preserve intact all the great sanctions and traditions of the law. It matters not how guilty a defendant in his opinion may be, it is his duty under oath

to see that no conviction takes place except in strict conformity to law. His primary considerations should be to develop the facts and the evidence for the guidance of the court and jury, and not to consider himself merely as attorney of record for the State, struggling for a verdict.''

We realize that the situation in some cases justifies very strong appeals by the prosecuting attorney to arouse the patriotism and sense of public duty of the jurors to perform the duty which the law and the evidence in a case plainly justifies and calls for.

The welfare of society and the safety and security of the great body of law-abiding citizenry can only be maintained by the just and courageous enforcement of the laws of the land, and all legitimate argument and full exercise of the greatest forensic talents of our public prosecutors are sometimes necessary to be directed to that end, and their fair and proper use should be permitted and encouraged rather than cramped or denied. But such arguments are all the more telling and effective when kept within proper bounds. No matter how heinous the offense or how guilty the accused appears to be, defendants, and defendants' counsel, have their rights, and these rights should be fearlessly and fully granted and safeguarded by the courts, especially in cases where great public excitement has been aroused. It has been, and God grant it may ever be, one of the chief glories of this fair land of ours that, as a general rule at least, no man be condemned without a hearing or punished without having first had an absolutely fair and impartial trial, according to our constitution and our laws. The fairness, as well as the firmness, of the enforcement of our criminal laws promotes respect for law and increases its deterrent effect.

Two of the assignments of error were based upon the exhibition by the State Attorney to the jury, during the course of his argument, of a subpoena which had been

issued at his request for a witness named Goldston and the sheriff's return showing that Goldston could not be found. Defendants had sharply criticised the State Attorney for not subpoenaing this witness. When the supoena was shown to the jury, the defendants' attorney did not make objection and get a ruling from the court, but merely remarked, "Note an exception to passing that supoena around." So this question is not properly presented here.

We might observe, however, that the attorney for the defendants had made the subpoena relevant by his charges; and inasmuch as the subpoena was a part of the court's records in the case, being a writ issued by the court in that particular case, there was under the circumstances no error in exhibiting it to the jury.

For the reasons above pointed out, we find no reversible error in the action of the court in denying the motion for new trial, and after a careful consideration of all the assignments of error, our conclusion is that no reversible error appears, and that the judgment of the court below must be affirmed.

Affirmed.

ELLIS, C. J., AND STRUM, J., concur.

WHITFIELD, P. J., AND TERRELL AND BUFORD, J. J., concur in the opinion.