[Crim. No. 11000. Second Dist., Div. Three. Apr. 13, 1966.]

THE PEOPLE, Plaintiff and Respondent, v. CHARLES WILLIAM DUKES, Defendant and Appellant.

Bruce Wolfe, under appointment by the District Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, and Lawrence R. Mansir, Deputy Attorney General, for Plaintiff and Respondent.

KAUS, J. — A jury convicted defendant of kidnaping (Pen. Code, § 207), probation was denied and he was sentenced to prison for the term prescribed by law. He appeals from the judgment.

Two contentions are advanced on appeal: 1. that the prosecutor committed prejudicial misconduct in asking certain questions of two witnesses called by defendant; and 2. that the court should have instructed the jury on assault and attempted kidnaping.

The following is a summary of the evidence: The complaining witness, Miss M. was waiting for a bus at 5:40 p.m. on October 24, 1964. Before then she had called her fiance and told him that she would meet him in half an hour. An Oldsmobile driven by defendant stopped. A male passenger got out of the car, "acted as if he had a gun" and forced her to enter the car by threatening that he would "blow [her] brains out."[1] She had never seen either man before. In the car she was seated between the two men and pleaded to be let out. The passenger started to slap and beat her.

They drove about 5 or 6 miles. She was taken to an apartment where another male person was present. The passenger pulled and shoved her into the apartment and into a bedroom where he raped her. After the act he went into a bathroom. Miss M. got partially dressed and ran out of the apartment. She rapped on the door of another apartment and received no answer. She then saw one Woodrow Smith whom she had

---

[1]This man was never apprehended and throughout the trial referred to as the "passenger."

known in college in Alabama come down a flight of stairs. She was crying and started a conversation with him. The passenger reappeared and threatened to kill her if she did not leave. He forced her back into the car. Defendant was again behind the wheel. Defendant told her not to cry, asked her where she wanted to go and dropped her at her fiance's place. The passenger had left the car earlier. She arrived there about 7:30 p.m. and got in touch with the police.

Cross-examination of Miss M. was relatively uneventful, although defense counsel made the most of the rather bizarre circumstances of the crime, the victim's lack of any visible marks of a struggle, her lack of physical resistance once the passenger had forced her into the bedroom and the fact that the rape did not cause any pain. It was also brought out that when she left the bedroom defendant was sitting in a chair somewhere in the apartment.

Woodrow Smith corroborated Miss M. to the extent possible. Asked why he did not help her, though she appeared to be in distress he said that he was "uncertain."

Miss M's. fiance—her husband at the time of trial—corroborated the appointment with him which was for about 6 o'clock and her arrival at 7:30.

The defense called two witnesses. The first, Karlton R. Blount a young man of 24 who had known defendant for 18 or 19 years, testified as follows: He arrived at the apartment in question at about 5 p.m. and was admitted by Duane Burton, defendant's roommate. Defendant, the passenger — whom Blount did not know—and Miss M. appeared sometime between 5:30 and 6 o'clock. They were briefly introduced. The passenger and Miss M. appeared to be lovers and disappeared into the bedroom for about 20 minutes. A Miss Beverly Davis came to the apartment while Miss M. and the passenger were in the bedroom. Miss M. and the passenger then went into the bathroom together, then back to the bedroom from which they reappeared fully clothed. She then asked the passenger to take her to church.[2] In the meanwhile defendant had been asleep in a chair. The passenger awoke him and the three left. Miss M. and the passenger were still holding hands.

Cross-examination established that the witness and defendant had been brought up together. The relationship was "just

---

[2]It had appeared from the fiance's testimony that he was employed by a church at the time in question.

like he's my brother.''[3] This statement was made in connection with the first set of "offensive" questions. Though the witness had seen defendant since he had become a suspect in the case he incredibly never "really discussed the facts" with him except to ask him why he was being held.

Redirect examination of this witness consisted of testimony that he had discussed the facts of the case with defense counsel.

The other defense witness was Duane Lee Burton whose testimony in chief was substantially the same as Blount's.

Cross-examination developed that he was 21 years old and at the time of the incident in question had been living with defendant for two or three months. From the start this witness was somewhat defensive about the possibility of a homosexual relationship between him and defendant, though in view of the question asked of Blount this is perhaps understandable.[4] After the colloquy set forth in the footnote the prosecutor went on to the facts which the witness had said he had observed. This was followed by another inquiry concerning the relationship of the witness to the defendant: "Q. Are you a homosexual, sir? A. No. Q. Never engaged in any homosexual activity? A. No. MR. WOLFE: Now, your Honor— THE WITNESS: No. MR. WOLFE: —this is the second time he has done this. THE COURT: This is the first time you have objected. Objection sustained. The jury is admonished to disregard it.''

The witness got himself into bad trouble on a rather minor point: he testified that he had learned two days after the incident that Dukes had been arrested for kidnaping. He

[3]The questions and answers leading up to this testimony were as follows: "Q. Are you a homosexual, sir? A. No, I am not. Q. The relationship with Mr. Dukes is just that of a friend, is that correct? A. My relationship with Mr. Dukes is just like brothers. My mother took care of him, and his mother used to stay over at the house. She used to take care of him. This is our relationship, just like he's my brother. Q. Like he's your brother? A. Yes.'' It will be noted that there was no objection by defense counsel.

[4]The record shows the following questions and answers during the first minute of cross-examination: "Q. Mr. Blount, how old are you, sir? A. 21. Q. 21? A. Yes. Q. And how did it happen that you were at Mr. Dukes' on this day, sir? A. Well, we were sharing an apartment. Q. Do you live with Mr. Dukes? A. Yes. Q. How long have you been living with Mr. Dukes? A. About two or three months. Q. Where did you meet Mr. Dukes at? A. Well, I met Mr. Dukes about three years ago. Q. You met him again, then, about two or three months ago? A. No, I've been knowing him all during this time, you know. But for quite a while I didn't see him. Q. And where was it that you met him, then, about two or three years ago? A. A friend of mine's. Q. Some male friend of yours? A. At a party. Q. And was this a male friend of yours who was having the party? A. It was a male friend, but there were males and females there.''

then moved from the apartment. At the time, in view of what he had observed, he did not think that anybody had broken any law. He did not, however, get in touch with the investigating officer to tell him what he knew because he ''was doing quite a bit of running around'' and also because he thought that Dukes was out of jail. Though repeatedly pressed to give a reason for such a belief he was unable to offer one. On redirect examination defense counsel established that after the arrest he had been in touch with him and asked him not to discuss the matter with anyone.[5] Then on recross examination the witness denied that the reason he had failed to contact the police was the attorney's admonition and reasserted his belief that Dukes was out of jail; however, the attorney who had interviewed him on January 11, 1965, several months after the crime, had not told him that Dukes was out of jail. He had formed the opinion that Dukes had been released on January 5, 6 or 11. Asked again why he made no attempt to get in touch with the police between October and January his answer was as follows: ''Well, it didn't seem like—I mean, seemed like it was a bunch of junk to me. I thought he had probably just been out of jail, so I didn't bother to ask anybody. Of course, I had things of my own to do.''

The defendant did not testify.

The first assignment of error relates to the questions directed to Blount and Burton concerning homosexuality. Although counsel for defendant alleges in his brief that during a discussion in chambers on this matter the court expressed the opinion that the ''comments'' by the prosecutor were prejudicial, we have been unable to find any support for that statement in the record. On the contrary, on motion for new trial the court made a remark which seems to point in the other direction.[6]

As far as the subject matter of the attempted impeachment is concerned, there was nothing necessarily improper about it. Whether or not homosexual relationships are disapproved or condemned by society, it cannot be denied that

---

[5]Presumably for the purpose of overcoming any inference of homosexuality, the presence of Beverly Davis, said by Burton to be his girl friend, was again mentioned. Miss Davis was never called as a witness.

[6]''In the first place, the first time the question was asked you didn't even object to it. The second time you objected to it, I sustained the objection. But, at any rate, the question, if anything, couldn't possibly have hurt the defendant. I think the jury could reasonably have believed that if the defendant were a homosexual, why would he be kidnaping a girl for immoral purposes. So I don't think that it necessarily was prejudicial.''

they frequently involve strong bonds of affection between the parties thereto. Section 1847 of the Code of Civil Procedure permits the "presumption" that a witness speaks the truth to be repelled by "evidence affecting his . . . motives . . . ." In *People* v. *Sweeney,* 55 Cal.2d 27 [9 Cal.Rptr. 793, 357 P.2d 1049], the Supreme Court said the following of evidence offered by the prosecution to discredit a witness by showing her relation to the defendant: "The challenged evidence was properly admissible as bearing on the interest and bias of Willie Williams and was not rendered improper because it disclosed defendant's extramarital relationship. The state of mind of a witness as to bias, prejudice, interest involved, friendship or hostility toward a party are all proper subjects for investigation in the trial of a case. (*People* v. *Wayne,* 41 Cal.2d 814, 830-831 [264 P.2d 547]; *People* v. *Gould,* 111 Cal.App.2d 1, 6 [243 P.2d 809]; *People* v. *Payton,* 36 Cal.App.2d 41, 54-55 [96 P.2d 991].)" (*Ibid.,* p. 41.)[7]

 On the other hand, although impeachment of a witness by the showing of a homosexual relationship with a party is not automatically prohibited, the subject is so sensitive that a prosecutor should not even be permitted to ask questions referring to it unless he does so in good faith. While the inference that the prosecutor has a "hidden source of information," to use the language of the Supreme Court in *People* v. *Perez,* 58 Cal.2d 229, 240 [23 Cal.Rptr. 569, 373 P.2d 617, 3 A.L.R.3d 946], about a witness' homosexuality is not perhaps as great as where he questions a witness about previous convictions of felony (see *People* v. *Perez, supra,* pp. 238-240), it is still there to some degree.

In the instant case the prosecutor's good faith in asking the offensive questions of the two witnesses was never challenged and perhaps we ought not to question it on the record before us. We note in his support Burton's defensiveness and his ambiguous admission that he was living with Dukes. Nor can we overlook the possibility—naturally not a matter of record —that the speech and demeanor of the two witnesses betrayed homosexual tendencies. This is somewhat buttressed by the fact that the trial judge, surely solicitous of the rights of the

---

[7] We do not mean to suggest that in a proper case the trial judge has no discretion to limit impeachment where there is a substantial danger of undue prejudice. (*People* v. *Winston,* 46 Cal.2d 151, 157 [293 P.2d 40]; cf *People* v. *Ford,* 60 Cal.2d 772, 801 [36 Cal.Rptr. 620, 388 P.2d 892]; Evid. Code, §§ 352, 765.) Nor are we concerned with the personal privilege of a witness to refuse to answer incriminating or degrading questions. (Code Civ. Proc., § 2065.)

defendant and of the witnesses, did not step in on his own initiative when the matter was first raised.

We could let the matter rest there were it not for the fact that in *People* v. *Perez, supra,* the Supreme Court reversed—to be sure among other reasons—because the prosecutor asked a witness whether he had been threatened, a question the witness answered in the negative, where there was no objection and thus no occasion for the prosecutor to attempt to prove his good faith.

While we have serious doubts that the Supreme Court by its handling of the problem with which it was faced in *Perez,* intended to imply a general rule that a prosecutor whose good faith is unchallenged must, to protect his record, make an affirmative showing of good faith, we will assume solely for the sake of argument that the questions asked of Blount and Burton were asked in bad faith.[8]

This however, is not the end of the problem. It will be remembered that there was no objection as far as the questions addressed to Blount are concerned and that in the case of Burton an objection was promptly sustained and the jury admonished to disregard the question. Under such circumstances *People* v. *Perez, supra,* itself recognizes that a reversal should only follow ''where the case is closely balanced and there is grave doubt of defendant's guilt and the acts of misconduct are such as to contribute materially to the verdict'' or ''where the act done or remark made is of such a character that a harmful result cannot be obviated or cured by any retraction of counsel or instruction of the court.'' (*People* v. *Perez, supra,* p. 247; *People* v. *Lyons,* 50 Cal.2d 245, 262 [324 P.2d 556].)

■ Considering the evidence herein as a whole, we cannot say that it is closely balanced. The prosecutrix testified most positively and was substantially unimpeached. Smith's testimony was strong corroboration of her story. The defense failed to produce a witness who should have been able to aid its version of the incident—Beverly Davis—and the two defense witnesses who did testify were materially impeached.

Nor can we say that in the case of the witness Blount any harmful implication could not have been obviated by an admonition, had one been requested or, in the case of the witness Burton, that such a result was not achieved by the court's prompt action. The harmful result of the prosecutor's

---

[8]We note that in *Perez* there was ample evidence in the record that the prosecutor was not too familiar with the limits of a fair prosecution.

questions has to be viewed in its setting. Both witnesses had powerful motives for coming to the aid of their "brother" and roommate respectively. The harm done by the insinuation of an additional motivation which might have been furnished by a homosexual relationship was, in truth, very slight. If an admonition to disregard a question was not effective in this case, we would have to say that it never is. We therefore find no reversible error in the questioning of the two witnesses.

██ Turning to the suggestion that the jury should have been instructed on assault and attempted kidnaping, we find no merit in it. There is of course no question that defendant was entitled to instructions on lesser offenses, if the evidence, however incredible, justifies them. (*People* v. *Modesto,* 59 Cal.2d 722, 729-731 [31 Cal.Rptr. 225, 382 P.2d 33].) The rule simply does not apply to the facts of this case. If the prosecutrix' story was believed, defendant was a principal to a kidnaping, either as an actor or as one who aided and abetted in its commission. (Pen. Code, § 31.) If the favorable inferences which defendant wanted the jury to draw from the testimony of his witnesses are accepted, he was not guilty of any crime with which he was charged or of any lesser included offense.[9] There was no middle ground. (*People* v. *Thomas,* 58 Cal.2d 121, 127 [23 Cal.Rptr. 161, 373 P.2d 97] ; *People* v. *Sutic,* 41 Cal.2d 483, 493 [261 P.2d 241] ; *People* v. *Hudgins,* 236 Cal.App.2d 578, 582-584 [46 Cal.Rptr. 199].)

The judgment is affirmed.

Ford, J., concurred.

Shinn, P. J., concurred in the judgment.

---

[9] We have found no case and none has been cited to the effect that assault is a necessarily included offense in the crime of kidnaping.