[Crim. No. 16678. Second Dist., Div. Five. Mar. 26, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
ROBERT LESLIE HAGEN, Defendant and Appellant.

COUNSEL

Robert Leslie Hagen, in pro. per., and Gilbert F. Nelson, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas C. Lynch, Attorney General, William E. James, Assistant Attorney General, and Jerold A. Krieger, Deputy Attorney General, for Plaintiff and Respondent.

OPINION

FRAMPTON, J.*—

## Statement of the Case

Defendant was charged by information with the robbery (Pen. Code, § 211) of one Reese Johnson while armed with a deadly weapon, to wit, a butcher knife. He entered a plea of not guilty. A motion to suppress evidence was made and such motion was denied. Thereafter, the information was amended to allege prior convictions of burglary in the State of North Dakota on July 27, 1957; forgery in the State of North Dakota on June 23, 1964, and aggravated assault in the State of Arizona on June 5, 1967. Upon arraignment, he denied the truth of the allegations of the prior convictions.

On February 21, 1969, a jury was impaneled and sworn to try the cause. At this time a motion to suppress evidence was made based upon the claim of an illegal police lineup identification. A hearing on this motion was conducted in the absence of the jury at the conclusion of which the court found "the lineup evidence is inadmssible and orders it suppressed." The trial was then continued to February 24, 1969. On February 24, 1969, the defendant moved to discharge the public defender and to proceed in propria persona indicating that he was not ready to proceed to trial in propria persona, but would need a 60-day continuance to prepare his defense. Both motions were denied.

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

On resumption of the proceedings before the jury, it was discovered that one juror was absent, having suffered a stroke, and would not be available to resume the trial. The defendant refused to proceed with 11 jurors and objected to the selection of an alternate juror. For these reasons the court declared a mistrial and a new jury was selected and the trial commenced.

At the conclusion of the People's case a motion to strike the priors was made out of the presence of the jury on the ground of their constitutional invalidity. On hearing of this motion the court found the prior convictions of burglary in North Dakota and aggravated assault in Arizona to be constitutionally invalid, and the prior conviction of forgery in North Dakota to be valid. All priors were ordered stricken as not being admissible to increase the punishment. The court ruled, however, that the prior forgery conviction could be used for the purpose of impeachment.

At the conclusion of the trial, the jury returned its verdict finding the defendant guilty of robbery and fixing the degree as robbery in the first degree. Probation was denied after hearing. Motions for new trial and to reduce the offense under section 1181, subdivision 6 of the Penal Code were denied, and the defendant was sentenced to state prison.

The appeal is from the judgment.

## Statement of Facts

Reese Johnson, the victim, was returning home about 2:30 a.m. on November 16, 1968, after having gone to a movie. As he was about to open his door, the defendant and another man approached him from behind, pressed a knife against his back and pushed him aside. The knife was held by the defendant at Johnson's neck and he was asked to hand over his wallet, ring and watch. While the other man held Johnson in the kitchen, the defendant went back and forth to the closet, emptying out the clothing and placing it on the couch. Each time the defendant got a load of clothing he would place the knife against Johnson's neck, threatening to kill him if he made a sound. The defendant told his companion to move the car to the front of the house and to load the clothing and the television set into the car. The two then stepped out to the car. Johnson then slammed the door to the apartment shut. The defendant returned and tried to kick in the door. Johnson yelled for his landlord to call the police, and his landlord replied, "I have." When Johnson yelled for his landlord to call the police, the defendant and his companion jumped in their car and sped away. There was taken, at the time of the robbery, Johnson's billfold, containing $48, all of his I.D. cards, his ring, watch, the keys to his apartment, and his transistor radio.

A short time after the defendant and his companion left, the police arrived. Johnson described the defendant to the police as "a light-skinned male Negro weighing approximately 160 pounds, approximately five feet nine inches tall," wearing a little black hat and a black raincoat, and about 28 to 30 years of age.

Thornton L. Evans, Johnson's landlord and occupant of the duplex adjacent to that occupied by Johnson, was awakened in the early morning hours of November 16th by the noise of things being dropped. He told his wife to call the police. He looked out his window and saw a man seated in a car and a second man on the sidewalk looking and talking to the man in the car. The man standing on the sidewalk seemed a little tall, and wore a black hat and a black coat. The man who was standing on the sidewalk then left the side of the vehicle, came to the porch, and started kicking on Mr. Johnson's door. Johnson shouted, "Mrs. Evans, call the police." The man then returned to the car and the occupants drove away. When Mr. Evans went over to the Johnson apartment he saw the couch covered with clothing and other items ready to load.

Joseph C. Clesceri was a police officer for the City of Los Angeles, attached to the University Detective Bureau, robbery investigation. About 8:30 on the morning of November 22, 1968, he received a call from Johnson who, on November 16, had signed a crime report alleging that he was the victim of a robbery during which his wallet and "identification" had been taken. Johnson told Clesceri that he had received a telephone call from the night desk man at the Palmer House who stated that Johnson's wallet had been found in one of the hotel rooms.

Officer Clesceri, from an interview with Johnson, and from the information contained in the crime report knew that one of the suspects had been described as a male Negro, light complected, 29 to 30 years of age, 5 feet, 9 inches in height, weighing 160 pounds, and who was wearing a black raincoat and hat at the time of the commission of the robbery.

Officer Clesceri arrived at the Palmer House about 9 a.m. on the 22d, and asked the desk clerk about the wallet. The desk clerk gave Officer Clesceri the wallet and informed him that the wallet had been found the night before by the hotel maid, Mrs. Freddie Mae Owens, in room 58.

Mrs. Owens found the wallet in the corner of a closet in room 58 on November 21 and gave it to the desk clerk. She had not cleaned this room every day, as she only cleaned the "check-outs every day."

By checking the hotel records, Officer Clesceri learned that a person named Robert Leslie Hagen was the registered occupant of room 58 from November 15 through November 17. He was also informed by the hotel

manager that Hagen had not returned to the room on November 18 and had been gone for approximately two days. Upon his return, Hagen had been given room 74, and was supposedly in room 74 at that moment. The hotel manager described Hagen to Officer Clesceri as a male person who, if he was a Negro, was extremely light complected, was approximately 5 foot, 10 inches to 6 feet tall, and who weighed about 150 to 160 pounds. Officer Clesceri considered this to be a good comparison with the description he already had of one of the robbery suspects.

The wallet contained a driver's license in the name of Reese Johnson bearing his description and home address. It also contained a photograph which Officer Clesceri recognized as that of Johnson. There were numerous credit cards and other miscellaneous items in the wallet bearing the name of Reese Johnson. The wallet was black in color and matched the description of the wallet reported stolen in the robbery.

James Coffee, the clerk of the Palmer House Hotel, testified that a Mr. E. Batson had registered in room 58 for the night of November 20.

At about 10 a.m. on the 22d, Officer Clesceri went to room 74 and knocked on the door. A voice from inside said "Who [is] there." Officer Clesceri stated, "Police officer." There was a pause and the door was opened. The defendant was dressed in a pair of shorts. Officer Clesceri entered the room and advised the defendant that he was being placed under arrest for the robbery.

Hanging on the door of the room was a three-quarter length black coat. There was also a hat laying on the dresser in the room. Both of these matched the description of the garments worn by the defendant at the time of the robbery. This clothing was taken by Officer Clesceri and was later received in evidence at the trial.

### Defense

The defendant testified in his own behalf. He denied ever seeing Johnson before the latter identified him at the University police station. He testified that on the evening of November 15, 1968, he had been at the Galaxie Club on the Sunset Strip, arriving there between 9:30 and 10 p.m., and leaving there around 2 a.m. of the 16th. He then went with two couples, whom he had met at the club, to a nearby restaurant for a short period of time and then went on with them to Malibu. They stayed at Malibu until sunrise. He and one Mike Gallagher then drove back to the Sunset Strip area of Los Angeles. On cross-examination he admitted to having been convicted of forgery in North Dakota in 1964, after being directed by the court to answer the question.

## Contentions on Appeal

The defendant, through court-appointed counsel, urges that (1) the officer's entry into the defendant's room was in violation of section 844, Penal Code, and the search and seizure which followed was in violation of the defendant's rights guaranteed by the Fourth Amendment of the United States Constitution; (2) it was prejudicial error to allow the impeachment of the defendant by a constitutionally invalid prior conviction of felony, and (3) it was prejudicial error for the trial court to refuse to allow the defendant to show that the victim, Reese Johnson, was a homosexual.

This court, ignoring the rule laid down in *People* v. *Mattson,* 51 Cal.2d 777, 798 [336 P.2d 937], which authorizes the striking of pro. per. briefs where the appellant is represented by competent counsel on appeal, allowed the defendant to file briefs in propria persona. In response to this generosity, the defendant has favored us with two briefs, the first entitled "Appellant's Closing Brief" and the second entitled "Appellant's Closing Brief (Supplemental)." The first brief consists of 61 pages, 3 exhibits, and contains 121 citations. The supplemental brief consists of 29 pages containing 47 citations. It would appear that we asked for it.

After some lengthy study of the two pro. per. briefs, we believe the defendant urges that (a) there was no probable cause shown for his arrest and the search and seizure which followed was illegal; (b) the arresting officer forcibly entered his hotel room; (c) the lineup procedure wherein he was identified by the victim violated his right to counsel at a critical stage of the proceedings, and was unfairly conducted; (d) inadequacy of representation by counsel; (e) improper denial by the trial court of defendant's right to proceed in propria persona; (f) Officer Clesceri's refusal to respond to a subpoena duces tecum violated defendant's rights guaranteed under the First, Fifth, Ninth and Fourteenth Amendments to the United States Constitution; (g) the prosecuting attorney was guilty of prejudicial misconduct in his closing argument to the jury; (h) the trial court committed reversible error in refusing to instruct in the language of "52-A CALJIC," and in refusing to allow defense counsel to argue the substance of this instruction to the jury; (i) the trial court committed prejudicial error in failing to instruct the jury as to the truth or falsity of the allegation that defendant was armed at the time of the commission of the offense in view of the fact that no weapon was produced or its existence corroborated, and (j) the trial court committed prejudicial error in failing to instruct the jury "as to the legal significance of evidence, or testimony offered as evidence, that had been submitted, and of which Judicial Notice had been taken for [*sic*]."

### Claimed Violation of Section 844 Penal Code

Section 844 of the Penal Code provides that "To make an arrest, a private person, if the offense be a felony, and in all cases a peace-officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired."

In construing the language "break open" as used in section 844 of the Penal Code, our Supreme Court has said: "Although the common law rule was first articulated to regulate entry by force, it is not limited to entries effected by physical violence. Section 844 is a codification of the common law. [Citation omitted.] At the very least, it covers unannounced entries that would be considered breaking as that term is used in defining common law burglary. [Citation omitted.] As so defined, no more is needed 'than the opening of a door or window, even if not locked, or not even latched. Pulling open a screen door held closed only by a spring is sufficient.' [Citation omitted.]" (*People* v. *Rosales,* 68 Cal.2d 299, 303 [66 Cal.Rptr. 1, 437 P.2d 489].) In *People* v. *Bradley,* it was held that officers walking into a dwelling through an open door at nighttime when the occupant apparently is asleep, where the consequences of such an unannounced intrusion could be resistance to the intruders and violent death or injury to them or others, including innocent third parties, constituted a violation of section 844 of the Penal Code. (*People* v. *Bradley,* 1 Cal.3d 80, 87-88 [81 Cal.Rptr. 457, 460 P.2d 129].)

Here, Officer Clesceri had probable cause to arrest the occupant registered in room 74, based upon the description he had of one of the robbers and the description he had of the occupant of room 74, together with information he had concerning the victim's wallet. He knocked on the door of room 74 and a voice from within stated "Who [is] there." Officer Clesceri stated, "Police officer." There was a pause and the door was opened voluntarily by the defendant. Officer Clesceri then crossed the threshold and placed the defendant under arrest. The officer did not "break open" the door as is proscribed by section 844 of the Penal Code. His crossing the threshold of the open door to effect the arrest of the defendant, under the circumstances of this case, did not violate any right of the defendant protected by the Fourth Amendment to the United States Constitution.

It is questionable whether the seizure of the hat and overcoat, which were in the plain view of the officer was the result of a search. (Cf. *People* v. *Yeoman,* 261 Cal.App.2d 338, 346 [67 Cal.Rptr. 869].) In any event, their seizure was incident to a lawful arrest. (*People* v. *Gilbert,* 63 Cal.2d

690, 707 [47 Cal.Rptr. 909, 408 P.2d 365].) The arrest and seizure having occurred in November 1968, the scope of the search is not governed by the rule laid down in *Chimel* v. *California* (1969) 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034]. (Cf. *People* v. *Castillo,* 274 Cal.App.2d 508, 513 [78 Cal.Rptr. 869].)

### Use of Prior Conviction to Impeach

The defendant urges that it was error to permit the prosecution to impeach the defendant by showing that he had previously been convicted on June 23, 1964, of forgery, a felony, in North Dakota, because it was not shown that the defendant was represented by counsel at the time of such conviction. The record does not support this contention.

The reporter's transcript shows that the defendant was first asked concerning his prior conviction for burglary in North Dakota (July 1957), at which time the defendant testified that he was not represented by an attorney. This was followed by the following questions propounded by his own counsel and the defendant's answers thereto: "Q. Did you at any later date serve some time in an institution in North Dakota? A. Yes. In 19— Q. Was that as the result of a felony conviction? A. Yes. Q. What was the felony? A. Forgery. Q. Did you have a lawyer at the time you were convicted? A. Yes."

■ The prior conviction for forgery in North Dakota was the only prior permitted to be used for the purpose of impeachment. There is no constitutional infirmity shown in respect to it. It was, therefore, proper to allow the prosecution to use it for such purpose.

### Refusal to Allow Defense to Show Victim Was a Homosexual

The defendant offered to prove that the victim had been previously arrested and convicted of violation of section 647a of the Penal Code (annoying or molesting children). That as a result of such conviction the victim was registered as a sexual deviate pursuant to section 290 of the Penal Code. That as a result thereof the victim was a homosexual. There was no offer made to show that the victim had suffered a previous conviction of a felony. The court rejected the offer of proof.

The defendant argues that at the outset he was charged with the commission of a serious offense while armed with a knife; the prosecution witness was the only person who could relate what happened at the time of the robbery; that it is reasonable to suppose that had the defendant been able to question the prosecuting witness about the events at the time

of the robbery in the light of the witness' status as a registered sexual deviate, a different story would have developed from the testimony of such witness, which would have given the defendant an opportunity to disprove either the charge of robbery, or the allegation that the defendant was armed, or both.

The defendant cites and relies on *People* v. *Rowland,* 262 Cal.App.2d 790 [69 Cal.Rptr. 269], and *People* v. *Dukes,* 241 Cal.App.2d 488, 493 [50 Cal.Rptr. 609], in support of his contention. In *Rowland* the defendant was charged with assault with a deadly weapon upon the victim. The defense was that the prosecuting witness was an aggressive homosexual and that the defendant, at the time of the shooting, was acting in self-defense in that he was attempting to ward off an aggressive homosexual act when the gun accidentally discharged. The trial court sustained objections to the defendant's questions tending to show that the prosecuting witness was, in fact, a homosexual. The appellate court, in reversing, held "We do not say that a person's being a homosexual per se makes his testimony suspect. For such purpose, the evidence would have been inadmissible. (Evid. Code, § 786.) However, homosexuality or a homosexual relationship is admissible when it goes to prove bias, interest, or motive of a witness. [Citation omitted.] If [the prosecuting witness] was a homosexual and if he was trying to pickup a male partner, there would be a strong motive or interest to camouflage his deviate personality disorder and possibly a criminal act [citation omitted] by giving testimony which would remove a possible complaining witness by causing the witness to be first convicted and incarcerated.

"On the other hand, if the defendant were able to establish through the witness Petway either by way of his opinion or knowledge of [the prosecuting witness'] reputation that [he] was a homosexual and by way of specific instances to prove that [the prosecuting witness] solicited other males in the bar and that it was necessary to evict him because of his solicitations or engaging in homosexual promiscuity [citation omitted], then the evidence would tend to prove that defendant was not making up a story out of whole cloth." (*People* v. *Rowland, supra,* p. 796.)

In *Dukes,* the prosecution undertook to ascertain whether a homosexual relationship existed between the defendant and two witnesses called in his behalf, to show bais of the witnesses. No objections were interposed to the questions asked of the first witness. Objections were sustained to questions asked of the second witness and the jury was admonished to disregard the questions. On appeal, the asking of such questions was assigned as reversible error. The court held that it was not improper, under the circumstances of that case, to undertake to impeach the witnesses on the basis of a

homosexual relationship between them and the defendant so long as the questions were asked in good faith by the prosecutor. (*People* v. *Dukes, supra,* 241 Cal.App.2d 488, 493-495.)

The facts in *Rowland* and *Dukes* are not apposite to the facts here under consideration. ■ Here, the defense was that of alibi, not justification. The defense undertook to show that the defendant did not participate at all in the robbery, not that he did participate but it occurred in a different manner than that described by the prosecuting witness. Hence, whether the victim was a homosexual or not did not relate in any way to the defendant's defense, and, therefore, there was no error in rejecting the defendant's offer of proof.

### Claim of Twice in Jeopardy

The record discloses that on February 21, 1969, a jury was impaneled and sworn to try the cause. The trial was then postponed to February 24, 1969, the jury was excused, and the court proceeded to take evidence upon the claim of an illegal police identification lineup. On February 24, 1969, one of the jurors was absent. The court received information that the juror had suffered a stroke and could not be available to proceed with the trial. The defendant declined to proceed to trial with 11 jurors and objected to the selection of alternate jurors for the purpose of selecting one of them to replace the missing juror.

At this juncture the court declared a mistrial and excused the 11 members of the panel. A new jury panel was summoned and examined by both sides. At the conclusion of the *voir dire* examination, the defendant through his counsel and the People accepted the new jury to try the cause. The new jury was then sworn and the trial proceeded.

■ Here, due to the objections interposed by the defendant to the selection of an alternate juror, no such alternate was selected and sworn to try the cause. This left the court no alternative but to declare a mistrial and proceed to the selection of a new panel. It was well within the power of the trial court to discharge the jury, under the circumstances here shown, and such discharge will not support the plea of former jeopardy. (*In re Devlin,* 139 Cal.App.2d 810, 812 [294 P.2d 466]; Pen. Code, § 1123; cf. *Hutson* v. *Superior Court,* 203 Cal.App.2d 687, 690 [21 Cal. Rptr. 753].)

The defendant's claimed errors set forth in his pro. per. briefs and heretofore designated as "a" and "b" do not require further comment here.

### The Lineup Identification

It has been held that a post-indictment lineup is a critical stage of the

proceeding at which the accused is entitled to be represented by counsel unless he intelligently waives such right. ■ And where it appears that such a lineup is conducted without counsel, absent an intelligent waiver, the in-court identification, upon proper motion, should be excluded unless the prosecution shall establish by clear and convincing evidence that such identification was based upon observations of the suspect other than the lineup identification. (*United States* v. *Wade*, 388 U.S. 218 [18 L.Ed.2d 1149, 1164, 87 S.Ct. 1926].)

■ Upon objection being raised that a pretrial identification lineup had been conducted in the absence of counsel and that such lineup was conducted in such manner as to taint the in-court identification of the victim, the trial court held a rather extensive hearing on the subject out of the presence of the jury. There was a conflict in the testimony of Officer Clesceri and that of the defendant as to whether the defendant had waived his right to counsel. There was also a conflict in the evidence as to whether the lineup was conducted fairly. At the conclusion of this hearing the court concluded that evidence of Johnson's identification of the defendant at the lineup should be excluded, but stated: "The Court is impressed with Mr. Johnson's testimony. And, from a practical standpoint, I don't think that you need any reference to the line-up, anyhow."

The testimony of the victim bearing upon his in-court identification of the defendant is set forth in the margin below.[1] The court was cognizant of

---

[1] "Q. Mr. Johnson, were you the victim of a robbery on November 16th of this year? A. That is correct, sir. Q. Approximately what time? A. About 3:00 a.m. in the morning. Q. And approximately how many assailants were there at the location at that time? A. There were two. Q. Were you able to observe both the assailants? A. Yes, sir, I was. Q. Were their faces covered? A. No, sir, their faces were not covered. Q. How long did the robbery take place? Over what period of time would you say it took, the robbery took place? A. I would say approximately—oh, went on for about a half an hour to 40 minutes, 45 minutes. Q. They had you remove all your clothes during this robbery, did they not? A. Well, this gentleman stripped my — jerked my pants off, pulled my jacket off. My pants — Q. You say 'this gentleman.' You mean the defendant? A. Yes. Q. Is that why this took such a long period of time to take place? A. No, because he was taking my clothes out of a closet. And loading them on the living room couch to put in a car to take away. Q. This robbery took place in your house? A. Just as I was putting the key into my door, going into my house, the defendant put a knife on me and forced me in along with the other gentleman. Q. Were the lights on in your house? A. No. The lights weren't on at the time. Q. No, during the 45 minutes, were the lights on in your house? A. Yes, sir. Q. Did you have the defendant under observation during this 45 minutes? A. Absolutely, sir.
"Mr. SHATZKIN: I have no further questions.
"CROSS-EXAMINATION
"BY Mr. FITZGERALD:
"Q. Mr. Johnson, did you attend a line-up at the University Station on the 22nd of November, 1968? A. I did, sir. Q. Did you make an identification at that line-up? A. I sure did. Q. Did you identfy the defendant, Mr. Hagen, sitting to my right? A. I most certainly did, sir. Q. Did you later testify at a preliminary hearing? A. I

the rule laid down in *Wade,* as it was presented and argued to the court by defense counsel in support of the motion to exclude the in-court identification. The court's statement that it was impressed with Mr. Johnson's testimony, followed by its denial of the motion to exclude the in-court identification of the defendant by Johnson, was tantamount to a finding that, based on Johnson's testimony, the prosecution had established by clear and convincing evidence that the in-court identification was not tainted by the pretrial identification lineup, but was based upon the observations of the suspect other than such lineup identification. There is substantial evidence in the record to support this implied finding.

### Adequacy of Representation by Counsel

The defendant urges that he was deprived of adequate representation by counsel.

■ To sustain the charge that a defendant has been denied his constitutional right to the effective aid of counsel in the preparation and trial of his case, an extreme case must be disclosed. It must appear that counsel's lack of diligence or competence reduced the trial to a farce or a sham. (*People* v. *Ibarra,* 60 Cal.2d 460, 464 [34 Cal.Rptr. 863, 386 P.2d 487].) The defendant has failed to make such a showing. On the contrary, the record discloses that he was adequately represented by competent counsel.

### Right to Proceed in Propria Persona

The information was filed on December 16, 1968. The defendant, being represented by a deputy public defender, was arraigned for plea on December 16, 1968, and the matter of his plea was continued to December

---

did. Q. At that time, did you identify Mr. Hagen as the perpetrator of this offense? A. I most certainly did, sir. Q. Now, was your identification of the defendant at the preliminary hearing aided by viewing him in a line-up before the preliminary hearing? In other words, did it help you in identifying him at the preliminary that you had seen him in a line-up before? A. Did it help me to identify him here? By seeing him in the line-up before? Is that what you said? Q. We'll take it slow. You identified the defendant at a line-up. Right? A. Right. Q. You later identified the defendant at a preliminary hearing. A. Right. Q. Right? A. Yes, sir. Q. Did seeing the defendant in a line-up assist you in identifying him at the preliminary hearing? A. It didn't necessarily assist me in identifying him in that preliminary hearing because of what I saw in the line-up. It was what I saw on the night, or the morning of the robbery. Q. So, viewing the line-up didn't assist you at all? A. Well, I knew it was the gentlemen who held me up. There was no question about that. Q. Didn't it help you to see him among other persons? A. Oh, of course. I mean, I pointed him out the first one. I mean, I wasn't — when he was the second man from the left — second man from the right, I would say — he was facing me — and the minute I peered through I identified him immediately, because of seeing him before. He was so many times in my face. Every time he'd go to the closet and get clothes, he'd come pack and put the knife at my neck and dare me to move. So, I couldn't help from identifying this man."

20, 1968. His plea of not guilty was entered on December 20 and trial was set for February 20, 1968. On February 14, 1968, a motion for pre-trial discovery was made, argued, and submitted. Ruling thereon was continued to February 17, and on that date the motion was granted. On February 20, 1968, a hearing was conducted on a motion made under section 1538.5, the information was amended charging three prior convictions of felony, the defendant was arraigned thereon and entered his denial thereof. Oral notice was given at this time that the defendant would move to strike the priors. The trial was trailed to February 21. On February 21, a jury was impaneled and sworn to try the case, and was excused until February 24. In the meantime evidence was taken on the 1538.5 motion. At this point the court ordered the lineup evidence suppressed.

On February 24, 1968, at the conclusion of the 1538.5 hearing and out of the presence of the jury, the defendant moved to relieve the public defender and to proceed in propria persona. When asked if he was ready to proceed and represent himself, the defendant replied that he was not, and would have to ask for a continuance of "probably 60 days." The court denied the motion. It was at this juncture that a mistrial was declared, a new jury panel was selected and sworn, and the trial proceeded.

 The defendant's constitutional right to be represented by counsel at all stages of the proceeding, and his constitutional right to represent himself are on a parity.

With respect to a defendant's right to counsel of his own choosing, it has been said that to hold that a defendant charged with a crime has an absolute right to counsel of his own selection, with unlimited right to insist upon continuances of his trial, would be subversive of the prompt administration and execution of the laws upon which depends largely their effectiveness. It is at once apparent that the trial court must, in the nature of things, have some control over such matters, to the end that judicial business may be dispatched in an orderly manner. (*People* v. *Thomas,* 58 Cal.2d 121, 131 [23 Cal.Rptr. 161, 373 P.2d 97]; cf. *People* v. *Carter,* 66 Cal.2d 666, 670 [58 Cal.Rptr. 614, 427 P.2d 214].) While a defendant in a criminal case has the constitutional right to waive counsel and represent himself if he knowingly and intelligently elects to do so, this does not mean that a defendant may appear by counsel and then, without advance notice, when the case is called, discharge his attorney as a device to force a postponement of the trial. (*People* v. *Johnson,* 258 Cal.App.2d 165, 169-170 [65 Cal.Rptr. 441].)

 Here, after the trial had commenced, the defendant without prior notice, sought to discharge his counsel and proceed in propria persona

under circumstances that would have required a postponement of the trial for approximately two months. The trial court, under these circumstances, was warranted in denying the defendant's request to change horses in the middle of the stream, and thus, to impede the prompt and orderly dispatch of the judicial business of the court.

We have examined the record in the light of the assignments of error herein designated by the letters "f," "h," "i," and "j," and find them to be without merit.

### Misconduct of Prosecutor

The defendant urges that the prosecutor was guilty of misconduct in his closing argument to the jury. A reading of the argument does not sustain this contention. Furthermore, the record discloses that not one objection was interposed to the conduct of the prosecutor during the entire closing argument. The defendant having failed to raise the claimed misconduct of the prosecutor at the trial, may not raise it for the first time on appeal. The claimed error is waived. (*People* v. *Wein,* 50 Cal.2d 383, 396 [226 P.2d 457]; *People* v. *Muszalski,* 260 Cal.App.2d 611, 625 [67 Cal.Rptr. 378].)

The judgment is affirmed.

Stephens, Acting P. J., and Aiso, J., concurred.

A petition for a rehearing was denied April 10, 1970, and appellant's petition for a hearing by the Supreme Court was denied May 21, 1970.