416 So.2d 1213 (1982)
Stephen SIAS, Appellant,
v.
The STATE of Florida, Appellee.
No. 80-1263.
District Court of Appeal of Florida, Third District.
July 20, 1982.
*1214 Bennett H. Brummer, Public Defender and Alan R. Dakan, Asst. Public Defender, for appellant.
Jim Smith, Atty. Gen. and Calianne P. Lantz, Asst. Atty. Gen., for appellee.
Before SCHWARTZ and DANIEL S. PEARSON and FERGUSON, JJ.
DANIEL S. PEARSON, Judge.
Sias appeals from his conviction and sentence on two counts of sexual battery arising out of alleged homosexual acts perpetrated upon a fourteen-year-old boy named Jeff. He asserts, inter alia, that the trial court erred in admitting over his objection evidence of another crime ostensibly offered to establish Sias' identity as the perpetrator of the crime charged and testimony that Sias was a homosexual.
The incident out of which the charges arose occurred on November 16, 1979. On that day, Jeff, along with some other young residents of Montani Clinical Center, went on a field trip to Greynolds Park. Jeff climbed onto the roof of a bridge to fish. His line became snagged in a tree and he lost his hook. He went below the bridge to look for another hook. There, a man whom Jeff had earlier noticed sitting on a bench smoking and whom he later identified as Sias, asked Jeff if he would like to smoke some marijuana. Jeff immediately agreed and, told that the marijuana was in the man's car, followed the man through the woods to get the marijuana. As they were walking along the path, a man later identified as Timothy Bartsch, Sias' co-defendant,[1] stepped out from the bushes and threw a blue denim jacket over Jeff's head. Jeff was dragged from the path. Bartsch told Jeff he would break his neck if he screamed. Sias then threatened Bartsch with harm if he hurt the boy. Sias and Bartsch pulled Jeff's pants down to his ankles and performed sex acts upon him. They then offered Jeff marijuana, smoked some themselves, pulled the jacket from Jeff's head, and sent him off. Jeff identified his assailants as between eighteen and twenty years old, one taller than the other, one wearing a bulky V-neck sweater, and the other with a large belt buckle and hushpuppy shoes.
The "similar" crime testimony was elicited from an eleven-year-old boy, Shawn, who testified to being sexually abused by two men on November 11, 1979, five days before the events charged in the information. Shawn testified that he was fishing in a place other than Greynolds Park, which he described as the enchanted forest. In Shawn's case, the incident began with him being grabbed from behind and pulled backwards into the woods. An orange T-shirt *1215 was thrown over his head, and it was by looking through the T-shirt that he got his first view of his assailants. Shawn's pants were pulled down, and the man he identified as Sias rubbed his body while the other man, whom he identified as Bartsch, performed oral copulation on Shawn. After the assault, Shawn ran and Bartsch chased and caught him. The assailants pulled the cloth from Shawn's head and sent him off. Shawn identified the taller assailant as wearing glasses and having a scratch on his neck and the other assailant as having a Latin accent.
The State contends that Shawn's testimony about the uncharged crime was relevant to prove that Sias was the person who committed the crime for which he was on trial and thus admissible under Williams v. State, 110 So.2d 654 (Fla. 1959).[2] It suggests that relevancy is established because there are more similarities than dissimilarities in the events involving Jeff and Shawn. Were this the test for admissibility, then it is likely that whenever two men acting in concert perpetrate assaultive sexual acts upon a young boy in an out-of-the-way part of a park, they would be subject to the introduction of testimony about another uncharged crime with the same scenario. However, we understand the test to be far more stringent  not merely that there be greater similarity than dissimilarity between the crimes, but rather that there be something so unique or particularly unusual about the perpetrator or his modus operandi that it would tend to establish, independently of an identification of him by the collateral crime victim, that he committed the crime charged. See Beasley v. State, 305 So.2d 285 (Fla. 3d DCA 1974). Accord, Duncan v. State, 291 So.2d 241 (Fla. 2d DCA 1974); Marion v. State, 287 So.2d 419 (Fla. 4th DCA 1974). Thus, in Davis v. State, 376 So.2d 1198 (Fla. 2d DCA 1979), the facts that the charged crime and the collateral crime involved burglary and sexual battery in which a window was used to enter the homes of young women who lived alone, occurred three weeks apart, and took place about the same time of night, and concluded with the taking of money from the victims' homes, did not establish the requisite uniqueness where the area of the city where the crime occurred, the manner in which the sexual assaults and the taking of money were accomplished, and the attitude of the assailants towards the victims were dissimilar. Likewise, in Helton v. State, 365 So.2d 1101 (Fla. 1st DCA 1979), a showing that in both crimes the female victim was abducted, taken to a wooded area where sexual acts were compelled or attempted, and where ultimately the victim escaped and hailed a passing car, was held insufficient to admit evidence that the defendant committed the collateral crime. See also Franklin v. State, 229 So.2d 892 (Fla. 3d DCA 1969) (evidence that defendant with gun drawn acting alone committed two robberies in Fort Myers not relevant to prove that defendant with hand under his shirt acted together with two other men to commit a robbery in Miami); Davis v. State, 276 So.2d 846 (Fla. 2d DCA 1973) (evidence that food store in Hillsborough County was robbed five days earlier by a man wearing a woman's bikini pants over his head, blue sock on his right hand, and kitchen towel on his left hand not relevant *1216 to prove that unadorned defendant accompanied by another man held up cleaner in same county); Banks v. State, 298 So.2d 543 (Fla. 1st DCA 1974) (sole relation between crime charged and collateral crime was that both involved homosexual acts perpetrated on young boys).
Turning to the facts of the present case, while the crimes have in common young boys as victims, isolated areas in parks, and similar homosexual acts, we think these things would be likely found in a vast number of such crimes and would hardly point to Sias as the perpetrator. However, other characteristics of the crimes persuade us that the collateral crime testimony was entitled to admission. First, on each occasion Sias was accompanied not only by another person, but, according to the identifications, the very same person. Second, although the crime against Jeff began with the enticement of marijuana and that against Shawn with force (explicable in light of the difference in age of the victims), both proceeded thereafter in nearly identical fashion  the piece of clothing thrown over the victim's head, the clothing kept on the victim's head during the sexual act, and, most significantly, the clothing removed after the completion of the sexual act and the victim directed out of the isolated wooded area. We think these latter facts comprise the type of singular behavior which qualifies the collateral crime evidence for admission. From the fact that the piece of clothing was removed after the sexual acts were complete and before the victims departed, it appears that placing clothing over the victims' heads was done less to conceal the identity of the assailants than as a ritual connected to the sex acts. Given the absence of marked dissimilarities, and the presence of other, concededly more general similarities, this act, in our view, makes the modus operandi unique and the evidence of the crime involving Shawn admissible.
Having decided that the other crime evidence was properly admitted, we now address the concern of the later Williams case, Williams v. State, 117 So.2d 473 (Fla. 1960):
"Inasmuch as evidence of the [other] crime was admissible only because of its relevancy to the identity of the accused and the murder weapon and the similarity of the pattern defined in the two incidents, the question then arises whether or not the state was permitted to go too far in introduction of testimony about the [other] crime so that the inquiry transcended the bounds of relevancy to the charge being tried, and made the [other] offense a feature instead of an incident. This may not be done for the very good reason that in a criminal prosecution such procedure devolves from development of facts pertinent to the main issue of guilt or innocence into an assault on the character of the defendant whose character is insulated from attack unless he introduces the subject." Id. at 475-76 (emphasis in original).
Where the evidence of the other crime is found to be so disproportionate as to become a feature of the case, reversals have followed. See, e.g., Williams v. State, 117 So.2d 473 (Fla. 1960); Knox v. State, 361 So.2d 799 (Fla. 1st DCA 1978); Davis v. State, 276 So.2d 846 (Fla. 2d DCA 1973), aff'd, State v. Davis, 290 So.2d 30 (Fla. 1974); Reyes v. State, 253 So.2d 907 (Fla. 1st DCA 1971); Green v. State, 228 So.2d 397 (Fla. 2d DCA 1969). Concededly, the record in the present case reflects that more time was spent and evidence presented on the collateral crime. However, this disproportion did not come about because the State went too far in presenting its evidence. Indeed, the testimony which the State elicited from Shawn was confined to that which was needed to establish its relevancy. The excessive focus on the Shawn incident instead occurred because the defense chose to attack the reliability of Shawn's identification of Sias and Bartsch as the people who sexually attacked him and to present an alibi defense to the Shawn incident. This, of course, Sias was free to do, but we will not hold the State accountable for Sias making the Shawn incident a feature of the case.
*1217 One other point merits discussion. The defendant urges that the trial court erred in admitting testimony that Sias was a homosexual. During the State's case in chief, the prosecutor questioned the police officer who had taken a statement from the defendant, which statement, as far as we can discern, was totally exculpatory. Undoubtedly, the prosecutor believed, as did the court when it overruled the defendant's objection, that the following portion of the statement was inculpatory:
"Q. Did you ever have any conversation with [Sias] concerning his homosexual preferences?
"A. Yes.
... .
"Q. And what did he tell you?
... .
"A. He told me he was a homosexual."
While the State suggests that the relevance of this testimony is that only one who is a homosexual would commit a homosexual battery, the suggestion is not well taken. First, the homosexual populace is certainly large enough as to make the relevance of this testimony so tenuous as to be almost non-existent. Second, there is absolutely no showing that homosexuals as a group are disposed to engage in pederasty. See People v. Giani, 145 Cal. App.2d 539, 302 P.2d 813 (1956); Beardslee v. United States, 387 F.2d 280 (8th Cir.1967). Third, assuming some arguable relevance in this testimony, its probative value is clearly outweighed by its prejudicial effect.[3] Thus, we agree with the holding in Harris v. State, 183 So.2d 291 (Fla. 2d DCA 1966), that a defendant's admission to a state witness that he was a homosexual and had slept with a number of men was irrelevant and highly prejudicial.
"The evidence admitted by the trial court in this case bore with deadly effect upon the character and propensities of the defendant. This is in violation of well-established precedent. It would be difficult to find a factual setting where the evidence was more clearly inadmissible due to a lack of relevancy and its sole purpose being to show bad character and propensity, thereby creating in the minds of the jurors more heat than reflecting light. "While we are not in sympathy with the alleged conduct of this defendant, he has the constitutional right, like every citizen, to a fair and impartial trial. In consideration of our societal attitudes regarding such alleged conduct it is necessary that all available safeguards be employed to insure such a trial. It is without question that the testimony in this case severely prejudiced the defendant and he was convicted not solely upon the acts set forth in the Information but also for being a homosexual and having committed numerous homosexual acts, for which he was not being tried." Id. at 294 (emphasis in original).
But while the admission of evidence that a defendant is a homosexual is irrelevant to prove that the defendant committed some particular assaultive homosexual act, that there may be some other justification for the admission of such evidence is demonstrated by the second testimonial episode concerning the defendant's homosexuality. This testimony came during the State's cross-examination of Bartsch, whom the defendant chose to call as an alibi witness:
"Q. Mr. Bartsch, are you a homosexual?
... .
"A. Yes, I am.
"Q. Is Stephen Sias a homosexual?
"A. That's for him to say.
"Q. Do you know if he is or not?
"A. Well, yes, I think so.
"Q. Are you two lovers?
"A. No, sir. We are roommates.
"Q. Have you ever engaged in any homosexual activities with Stephen Sias?
... .
"A. Yes, I have.

*1218 ... .
"Q. How long have you been roommates?
"A. About four years."
It is axiomatic that a party may attack the credibility of a witness called by the opposition by showing that the witness is biased. See § 90.608(1)(b), Fla. Stat. (1979).
"It is permissible to show the relations existing between a witness and the party for whom he testifies, or whether he is under personal obligations to such party, or to one as closely identified with the result of the trial as the mother, father or wife of such party. This does not necessarily discredit the testimony of a witness, but the jury may give it such weight as they see fit, in connection with the other evidence and the demeanor of the witness upon the stand, in determining the accuracy, truthfulness and sincerity vel non of such witness, and what credit they will accord to his testimony." Henderson v. State, 94 Fla. 318, 333-34, 113 So. 689, 695 (1927) (emphasis in original).
If in showing the bias of a defense witness in a criminal case the prosecutor incidentally elicits testimony that would be otherwise inadmissible against the defendant, the testimony is not ipso facto rendered inadmissible. People v. Sweeney, 55 Cal.2d 27, 9 Cal. Rptr. 793, 357 P.2d 1049 (1960) (evidence that defendant's witness was his paramour admitted to show her bias in favor of the defendant, not inadmissible because it disclosed defendant's extramarital relationship). And merely because the testimony showing bias includes references to defendant's homosexuality does not disqualify it from admission. People v. Dukes, 241 Cal. App.2d 488, 50 Cal. Rptr. 609 (1966). In Dukes, the court affirmed the defendant's conviction over his objection that two defense witnesses were cross-examined concerning their homosexual relationship with the defendant:
"As far as the subject matter of the attempted impeachment is concerned, there was nothing necessarily improper about it. Whether or not homosexual relationships are disapproved or condemned by society, it cannot be denied that they frequently involve strong bonds of affection between the parties thereto.
... .
"On the other hand, although impeachment of a witness by the showing of a homosexual relationship with a party is not automatically prohibited, the subject is so sensitive that a prosecutor should not even be permitted to ask questions referring to it unless he does so in good faith." Id., 50 Cal. Rptr. at 613.[4]
Cf. Alford v. State, 307 So.2d 433 (Fla.), cert. denied, 428 U.S. 912, 96 S.Ct. 3227, 49 L.Ed.2d 1221 (1975) (frustrated and unfulfilled homosexual act within an hour preceding heterosexual rape and murder admissible to show motive for later crime); State v. Statewright, 300 So.2d 674 (Fla. 1974) (testimony relating to defendant's involvement in homosexual act and homosexual tendencies admissible to show that motive for murder was defendant's fear that victim would publicly reveal the defendant's homosexuality; and police officer's testimony concerning defendant's prior homosexual act admissible to impeach defendant who during direct examination testified that he never participated in a homosexual act).
Thus, the questioning of Bartsch concerning his homosexual relationship with Sias was proper to demonstrate Bartsch's bias in favor of Sias. Sias requested no instruction to the jury that this evidence should be considered by them only as it bore on Bartsch's credibility, and any error in the trial court's failure to give such an instruction was waived. Finally, since this evidence was properly admitted, the error in admitting the police officer's testimony that Sias admitted his homosexuality is harmless.
Affirmed.
NOTES
[1] The trials of Sias and Bartsch were severed when Bartsch agreed to testify on Sias' behalf in a separate trial.
[2] The crime in the present case was committed after the effective date of the Florida Evidence Code. By Section 90.404(2), Florida Statutes (1979), the legislature has codified the Williams Rule, and thus, similar fact evidence of other crimes "is inadmissible when the evidence is relevant solely to prove bad character or propensity." Despite recent expressions of disenchantment with the ban on propensity evidence in child sexual molestation cases, see, e.g., Espey v. State, 407 So.2d 300 (Fla. 4th DCA 1981); State v. Rush, 399 So.2d 527 (Fla. 2d DCA 1981), we are bound to follow not only Williams, but its codified version. While it is true, as was observed in Cotita v. State, 381 So.2d 1146 (Fla. 1st DCA 1980), that Williams suggests that collateral crime evidence could be relevant to establish "a pattern of criminality," the court in Williams at the same time rejected the notion that evidence of other crimes could be admitted solely to show propensity. Thus, "pattern of criminality" must mean something other than that the defendant committed a like crime in the past, for if not, admission of evidence under this theory would swallow up the rule barring evidence to show propensity. See Cotita v. State, supra, at 1151 (Smith, R.P., J., dissenting).
[3] The State admitted at oral argument of this case that it could not conceive of a prosecutor attempting to elicit testimony that a defendant accused of an assaultive heterosexual crime was an admitted heterosexual.
[4] Since Bartsch admitted his homosexual relationship with Sias, there can be no question of the good faith of the prosecutor in asking the questions of Bartsch.